# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AT WORLD PROPERTIES, LLC, d/b/a @properties, | )<br>)<br>) |
| Plaintiff, | )<br>) No. 18-cv-01973 |
| v. | )<br>) Judge Andrea R. Wood |
| BAIRD & WARNER REAL ESTATE, INC., | )<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Defendant Baird & Warner Real Estate, Inc. ("B&W") and Plaintiff At World Properties, LLC, d/b/a @properties ("@properties") are real estate brokerage companies serving the City of Chicago and the surrounding area. Beginning in February 2018, B&W launched a series of advertisements celebrating its accomplishments in 2017. Among B&W's 2017 achievements touted in those advertisements were its $8.8 billion in sales and 32,000 transactions. However, according to @properties, B&W artificially inflated both of those figures. Therefore, @properties filed the present lawsuit against B&W for false advertising under both the Lanham Act, 15 U.S.C. § 1125(a), and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2. Now before the Court is B&W's motion to dismiss the Second Amended Complaint ("SAC") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 77.) For the following reasons, B&W's motion to dismiss is denied.

## BACKGROUND

Both B&W and @properties are residential real estate brokerage companies that compete with each other in the real estate brokerage market in the City of Chicago, its surrounding counties (known together with the City of Chicago as "Chicagoland"), and Wisconsin. (SAC ¶¶ 7-

–9, 14, Dkt. No. 71.)[1] At issue in this action are statements that B&W made in several advertisements claiming that in 2017, B&W had $8.8 billion in sales and 32,000 transactions. (*Id.* ¶¶ 20, 29, 31.)

Contrary to B&W's representations, an industry real estate data aggregator and distributor known as Midwest Real Estate Data reported that in 2017, B&W's total volume for properties listed and sold was approximately $5.7 billion and its total number of sales was 17,168. (*Id.* ¶¶ 10, 33.) Similarly, a survey ranking the "nation's Top 500 residential real estate firms by 2017 sales volume" reported that B&W's nationwide sales volume in 2017 for closed real estate transactions was approximately $5.8 billion and its total number of transactions that year was 17,450. (*Id.* ¶ 34.) On the other hand, in 2017, @properties's total volume for properties listed and sold was approximately $8.5 billion and its total number of transactions was 17,153. (*Id.* ¶ 35.) According to @properties, B&W inflated its sales and transactions figures by including not just its real estate brokerage sales and transactions, but also mortgage originations and refinances performed by its affiliate, Key Mortgage Services, Inc. ("Key Mortgage"), and title searches, title insurance services, and other title-related services performed by its affiliate, Baird & Warner Title Services, Inc. ("BWT"), as well as two other companies, Starck Title ("Starck") and Landtrust National Title ("Landtrust"). (*Id.* ¶ 36.) Those figures also included property rentals and leases for which B&W acted as the agent. (*Id.*) Finally, @properties alleges that B&W inflated its sales and transactions figures by double- or triple-counting certain transactions.[2] (*Id.* ¶ 123.)

---

[1] For purposes of the motion to dismiss, this Court accepts as true the well-pleaded facts in the Second Amended Complaint and views those facts in the light most favorable to @properties. *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826–27 (7th Cir. 2015).

[2] As an example, @properties alleges that,

> if B&W acted as the real estate broker for the purchase of a property for $100,000, the purchasers of the property obtained a mortgage from Key Mortgage in the amount of

The challenged representations first appeared in an advertisement published in an email distribution from Chicago Agent Magazine, a publication catering to Chicagoland's top real estate agents, brokers, developers, and mortgage professionals. (*Id.* ¶¶ 21–22.) The email's subject line states "Our 2017 Stats Are Pretty Interesting." (*Id.* ¶ 26.) In the body of the email, B&W's advertisement touts "IT'S OFFICIAL. WE CRUSHED 2017." (*Id.* ¶ 27.) Below that exclamation are two columns making several representations, including the challenged representations concerning $8.8 billion in sales and 32,000 transactions. (*Id.* ¶¶ 28–32.) Nowhere in the advertisement does B&W qualify the sales and transactions figures, explain its calculation method, or provide a data source. (*Id.* ¶¶ 30, 32.) The advertisement also makes no mention of Key Mortgage, BWT, Starck, or Landtrust. (*Id.* ¶ 37.)

The Chicago Agent Magazine advertisement also includes a hyperlink directing readers to a blog post on B&W's publicly-available website, titled "2017 Has Been Good to Us." (*Id.* ¶¶ 68, 72.) That blog post again repeats the $8.8 billion in sales and 32,000 transactions figures. (*Id.* ¶¶ 73, 77.) In the opening paragraph, the post celebrates B&W's 2017 as a year that "really seems to stand out." (SAC, Ex. 2, Dkt. No. 71.) Continuing, the next sentence states that, "[i]t's almost hard to believe everything that happened, and not just with our residential sales company, but with our mortgage and title companies, too." (SAC ¶ 78; SAC, Ex. 2.) The next paragraph states that B&W "won Top Workplace in our industry for the sixth year in a row from the Chicago Tribune and #1 Top Workplace in all of Chicago." (SAC ¶ 79; SAC, Ex. 2.) It then claims that the "$8.8

---

$80,000, and the purchasers of the property used BWT as their title company, B&W would have: (a) considered those three distinct transactions for purposes of the 32,000 transactions figure; and (b) added the $100,000 for the property purchase, the $80,000 for the mortgage origination, and $100,000 for the title insurance or other services into the "$8.8 billion in sales" figure, such that $380,000 would have been added to the "sales" figure for what was a $100,000 transaction.

(SAC ¶ 123.)

billion in sales and more than 32,000 transactions [B&W] did last year is evidence that [B&W's] clients and [B&W's] agents across Chicagoland are onto something." (SAC ¶ 73; SAC, Ex. 2.) Again, B&W does not qualify those numbers, explain its calculation method, or provide a data source. (SAC ¶ 74.) Four paragraphs in, the blog post notes that "[t]he other businesses in our family had impressive results too," expressly identifying BWT and Key Mortgage and extoling accolades each company received in 2017. (SAC ¶¶ 81, 83; SAC, Ex. 2.) In particular, Key Mortgage was named a "top employer" by National Mortgage Magazine and BWT was rated among the "Top 3 Title Companies in Illinois" by Fidelity National Title Group. (SAC ¶ 83; SAC, Ex. 2.) The blog post does not mention Starck or Landtrust. (SAC ¶ 87.)

In addition, B&W or its agents made one or both of the $8.8 billion in sales and 32,000 transactions representations in several internet advertisements posted on publicly accessible websites and social media sites. (*Id.* ¶¶ 91–93.) On its Facebook page, B&W made a post on February 16, 2018 stating, "2017 has been good to us, from winning Chicago Tribune's Top Workplace in our industry for the sixth year in a row to doing $8.8 billion in sales. Seems like we're on to something, and we don't plan to stop here." (*Id.* ¶ 98.) Similarly, a Facebook post on B&W's Oak Park/River Forest office read, "With over $8.8 billion in sales, over 500 new brokers, 3 new offices, No 1 [*sic*] Top Workplace… the list goes on and on. It's official, we've crushed it in 2017. #bairdwarner #itseasierhere #joinbw." (*Id.* ¶ 104.) That same B&W Office also posted on Instagram a photographic rendition of the body of the Chicago Agent Magazine advertisement with its representations of $8.8 billion in sales and 32,000 transactions. (*Id.* ¶ 110.) Further, several B&W real estate brokers have made one or both of the $8.8 billion in sales and 32,000 transactions representations on their personal websites or social media accounts. As with the Chicago Agent Magazine advertisement and the B&W blog post, none of these internet

4

advertisements qualify the numbers, explain how they were calculated, or provide a data source. (*Id.* ¶¶ 99, 105, 111, 117.) Nor do any of the internet advertisements mention Key Mortgage, BWT, Starck, or Landtrust. (*Id.* ¶¶ 101, 107, 113, 119.)

## DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual allegations, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). For claims under the Lanham Act alleging false advertising, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) also apply. *Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F. Supp. 2d 704, 709 (N.D. Ill. 2006). Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This means that the plaintiff must plead "the who, what, when, where, and how" of the alleged fraud. *Conditioned Ocular Enhancement*, 458 F. Supp. 2d at 709.

In its SAC, @properties sets forth deceptive advertising claims under both the Lanham Act and the Illinois Uniform Deceptive Trade Practices Act. Specifically, @properties contends that B&W's claims of $8.8 billion in sales and 32,000 transactions in 2017 were both false statements of fact because those figures included not just B&W's real estate brokerage sales but

5

also property rentals, leases, and mortgage and title services, many of which were performed by Key Mortgage, BWT, Starck, or Landtrust.

The Lanham Act prohibits the use of any "false or misleading representation of fact" in commercial advertising that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1). For a plaintiff to establish liability, it must prove that

> (1) the defendant made a material false statement of fact in a commercial advertisement; (2) the false statement actually deceived or had the tendency to deceive a substantial segment of its audience; and (3) the plaintiff has been or is likely to be injured as a result of the false statement.[3]

*Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381–82 (7th Cir. 2018). There are two types of actionable statements under the Lanham Act: "those that are literally false and those that are literally true but misleading." *Id.* at 382. Here, @properties has elected to proceed only on a theory of literal falsity. A literally false statement is one that is "bald-faced, egregious, undeniable, over the top." *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009). "The inquiry asks whether the defendant made an explicit representation of fact that on its face conflicts with reality." *Eli Lilly*, 893 F.3d at 382. Where a plaintiff contends that a statement of fact is literally false, it need not produce extrinsic evidence of actual consumer confusion to prevail because such a statement "will necessarily deceive consumers." *Id.*

B&W argues that @properties's SAC should be dismissed because neither the $8.8 billion in sales nor the 32,000 transactions figure was literally false. B&W contends that the words

---

[3] Where a complaint asserts both a Lanham Act claim and an Illinois Uniform Deceptive Trade Practices Act claim based on the same underlying facts, the Illinois Uniform Deceptive Trade Practices Act claim "must rise or fall based on the Lanham Act claim." *Dynamic Fluid Control (PTY) Ltd. v. Int'l Valve Mfg., LLC*, 790 F. Supp. 2d 732, 739 (N.D. Ill. 2011).

6

"sales" and "transactions" have expansive meanings that encompass not just real estate brokerage sales and transactions but also all the other services it offers. Further, B&W asserts that including in those figures the sales and transactions consummated not just by B&W but also by Key Mortgage, BWT, Starck, and Landtrust was not literally false because those companies are B&W affiliates and thus part of the B&W family. And even if it did make a false statement of fact in its sales and transactions representations, B&W contends that @properties cannot establish that the misrepresentations were material or caused any injury to @properties.

## I. False Statements of Fact

The Court first addresses whether B&W made false statements of fact when it claimed to have enjoyed $8.8 billion in sales and performed 32,000 transactions in 2017. @properties claims that these numbers are false because they include not just B&W's real estate brokerage sales and transactions, but also account for B&W's property rentals and leases along with Key Mortgage, BWT, Starck, and Landtrust's mortgage and title services. By including those other services and figures from other companies, @properties argues, B&W has artificially inflated its sales and transactions numbers, thereby giving the false impression that B&W's 2017 real estate sales and transactions were higher than they actually were.

According to @properties, B&W's representations concerning its sales and transactions are literally false because the common definitions of the two terms refer to the transfer of real property and do not include the property rentals, leases, and mortgage and title services that B&W used to arrive at the $8.8 billion and 32,000 numbers. In assessing whether a statement is literally false, courts should be mindful that "'literal' must be understood in the common colloquial sense in which Americans . . . say things like 'I am literally out of my mind.'" *Schering-Plough*, 586 F.3d at 512–13. Thus, "the meaning of the alleged literal falsehood must be considered in context

7

and with reference to the audience to which the statement is addressed." *Id.* In assessing the literal falsity of a statement, a court must consider how the statement would be understood by a "linguistically competent person." *Id.* at 513. However, a statement that is ambiguous cannot be literally false. *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) ("[O]nly an unambiguous message can be literally false." (internal quotation marks omitted)); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 275–76 (4th Cir. 2002) (finding that where an advertisement can reasonably be understood as conveying different messages, a literal falsity argument must fail). Instead, where a statement is ambiguous or literally true but misleading in context, the Lanham Act allows for an implied falsity claim. *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1089 (7th Cir. 1994). But @properties opted against proceeding on such a theory. In fact, @properties previously raised an implied falsity claim in its First Amended Complaint but dropped it after amending the complaint a second time. (*See* First Am. Compl. ¶¶ 129–39, Dkt. No. 48.)

The SAC offers definitions of the words "sales" and "transactions" from Meriam Webster's Dictionary to show how neither term includes property rentals, leases, and mortgage and title services. Notably, @properties selectively picks from the definitions provided to highlight only the version that supports its preferred reading of the terms. For "sale," the SAC states that Merriam-Webster defines the word to mean "the act of selling; *specifically* : the transfer of ownership of title to property from one person to another for a price." (SAC ¶ 46.) Yet that same entry goes on to define "sales," plural, as the "operations and activities involved in promoting and selling goods or services" or "gross receipts." Sale, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/sale (last visited July 29, 2019). The first definition explicitly recognizes that services are capable of being sold. Similarly, the definition of gross

8

receipts is "the total amount of value in money or other consideration received by a taxpayer in a given period for goods sold or *services performed*." Gross Receipts, Merriam-Webster, *available at* https://www.merriam-webster.com/legal/gross%20receipts (last visited July 29, 2019) (emphasis added); *see also* Gross Receipts, Black's Law Dictionary (11th ed. 2011) ("*Tax.* The total amount of money or other consideration received by a business taxpayer for goods sold or services performed in a taxable year, before deductions."). For "transaction," the SAC cites Merriam-Webster's definition of "something transacted; *especially* : an exchange or transfer of goods, services, or funds." (SAC ¶ 47.) That definition again specifically recognizes that a transaction may involve an exchange of services.

At the very least, the dictionary definitions create ambiguity concerning the scope of the words "sales" and "transactions." Indeed, it is difficult to see how the revenue derived from property rentals, leases, and mortgage and title services cannot be deemed part of B&W's "gross receipts." And the definition of "transaction" can certainly include property rentals, leases, and mortgage and title services. Certainly, paying money for a mortgage origination or a title search could constitute "an exchange or transfer of goods, services, or funds." (SAC ¶ 47.) As one court observed when addressing a comparable situation in which a real estate broker claimed to have the "most total transactions," "[t]he word 'transactions' in this context carries many potential meanings—does it include leases and referrals; does it cover homes or all properties sold; does it include the selling side of the transaction, the buying side, or both?" *In re Century 21-RE/MAX Real Estate Advertising Claims Litig.*, 882 F. Supp. 915, 923 (C.D. Cal. 1994). Ultimately, that court concluded that because the "statement is ambiguous, it cannot be considered literally false." *Id.* The same logic applies here with respect to how B&W compiled its transactions number. And given that "sale" is a synonym for "transaction"—a fact that @properties specifically highlights in

9

the SAC (SAC ¶ 48)—the logic may further be extended to the word "sale." Because of this ambiguity, @properties cannot claim that B&W's inclusion of these other services in its sales and transactions numbers is literally false.

Nonetheless, @properties claims that "sales" and "transactions" are understood in the real estate brokerage industry to refer "to the exchange of ownership interest and title of a parcel of real property from one person or entity to another person or entity." (SAC ¶ 54; Pl.'s Opp'n at 9 & n.5, Dkt. No. 78.) This argument, however, is better suited to an implied falsity claim, where the inquiry focuses on "what does the person to whom the advertisement is addressed find to be the message?" *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (7th Cir. 1992). It is not the domain of a literal falsity claim to evaluate the specialized understandings of consumers in a particular market; rather, a literal falsity claim asks only how an advertisement would be understood by a "linguistically competent person." *Schering-Plough*, 586 F.3d at 513. Moreover, to establish that potential real estate brokerage clients have a specific understanding of the words "sales" and "transactions," @properties would necessarily have to introduce evidence such as consumer surveys. Again, the Seventh Circuit has held that such evidence is not required for literal falsity claims. *Eli Lilly*, 893 F.3d at 382. In short, the words "sales" and "transactions" are sufficiently ambiguous that a linguistically competent person could understand them to include not just real estate brokerage sales, but also property rentals, leases, and mortgage and title services.[4] To the extent @properties predicates its literal falsity claim on the fact that B&W's $8.8 billion in sales and 32,000 transactions numbers are not limited to real estate brokerage sales, its claim cannot proceed.

---

[4] The alleged double- and triple-counting does not alter this Court's analysis. Using the example from *supra* n.1, the actual property sale, mortgage origination, and purchase of title insurance are each discrete sales and transactions. Thus, including all three in the count is not literally false.

Yet there is a second component to @properties's literal falsity contention. Not only do B&W's sales and transactions figures include property rentals, leases, and mortgage and title services, but they also include sales and transactions consummated by Key Mortgage, BWT, Starck, and Landtrust. Thus, @properties also asserts that B&W's numbers are literally false because they are artificially inflated by the inclusion of other companies' sales. In response, B&W argues that including those companies' sales is not literally false because they are B&W affiliates.

It is a closer question whether a company claiming the sales of affiliated entities under its own umbrella has made a literally false statement. Perhaps B&W would have a stronger case for dismissal if only Key Mortgage and BWT's sales and transactions were included in the $8.8 billion and 32,000 numbers. As even the SAC concedes, both Key Mortgage and BWT are B&W affiliates. (SAC ¶ 36.) Especially with respect to BWT, which includes "Baird & Warner" in its own name, a linguistically competent person may well understand B&W's sales and transactions figures to include BWT's sales and transactions. Moreover, the blog post on B&W's website begins by noting that 2017 was a great year not just for "our residential sales company, but with our mortgage and title companies, too." (SAC, Ex. 2.) Later in the post, it expressly names Key Mortgage and BWT as businesses in its family. (*Id.*) At least for the blog post, this additional context could very well take the representations out of the literally false territory. Ultimately, the issue may turn on the exact nature of the corporate relationship between the affiliates. While B&W emphasizes that it previously pleaded in its answer to the First Amended Complaint that Key Mortgage and BWT are B&W's wholly-owned subsidiaries (Def.'s Reply at 3 n.3, Dkt. No. 80 (citing Def.'s Answer to First Am. Compl. ¶¶ 36–42)), at the motion to dismiss stage, the Court will not consider facts outside of the SAC.

In any case, the SAC does not allege that Starck and Landtrust are B&W affiliates. B&W again attempts to "answer" @properties's allegations by stating in its reply brief that Starck and Landtrust are B&W affiliates. (*Id.*) However, even if this were a Rule 12(c) motion for judgment on the pleadings (and a hypothetical answer to the SAC could be considered), the Court would still have to "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). Under this standard, it is reasonable to infer from the SAC that Starck and Landtrust have no relationship with B&W. And if, in fact, B&W included sales and transactions from wholly unaffiliated entities in its $8.8 billion in sales and 32,000 transactions figures, it would have made a literally false statement. For that reason, the Court cannot grant the motion to dismiss, insofar as B&W argues that @properties did not sufficiently plead a literally false statement.[5]

## II. Materiality

B&W additionally contends that even if it made a literally false statement concerning its sales and transactions numbers, that falsehood was not material. For a literally false statement to be actionable, the statement must be material. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999). A materially false statement is one that "is likely to influence [a consumer's] purchasing decision." *Id.*; *see also Marvellous Day Elec. (S.Z.) Co. v. Ace Hardware Corp.*, 900 F. Supp. 2d 835, 842 (N.D. Ill. 2012) ("This [materiality] requirement is based on the premise that not all deceptions affect consumer decisions."), *vacated in part on other grounds*, Nos. 11 C 8756, 11 C 8768, 2013 WL 2356008 (N.D. Ill. May 28, 2013).

---

[5] Because it is sufficient for present purposes for the Court to conclude that B&W's inclusion of Starck and Landtrust's sales and transactions would render B&W's sales and transactions figures literally false, the Court passes no judgment on whether including the sales and transactions of Key Mortgage and BWT in B&W's count would independently support a literal falsity claim. That issue may be resolved following further factual development.

In the SAC, @properties seeks to establish materiality by citing an article stating that a "real estate broker's sales volume and position in the real estate market are material to a consumer's decision regarding which real estate brokerage firm to choose." (SAC ¶ 136 (citing Kirk Wakefield, et al., *What Do Consumers Expect From Real Estate Agents?*, Keller Ctr. Research Report (Nov. 2008)); *see also* Def.'s Reply, Ex. 1, Dkt. No. 80-1 (attaching cited article).) However, B&W argues that @properties grossly mischaracterizes the article, which focuses on a consumer's selection of an individual agent rather than a brokerage firm. Indeed, at times, the article appears to focus more on the individual agent rather than the real estate brokerage firm the agent works for. But at other times, the article also recognizes how the reputation of the brokerage company can boost an agent because it "can lead to greater attractiveness or demand for the brand." (Def.'s Reply, Ex. 1 at 2; *see also id.* ("So, it might seem bothersome when another agency from the same realty company opens close to yours, but it may help overall as customers begin to associate your realty brand with that area.").)

In any case, it is reasonable to infer from the allegations in the SAC, that one sign of a well-established agency is its number of sales and transactions, and thus a potential client would be more likely to select a real estate brokerage company that has a high volume of sales and transactions. At the pleading stage, that is sufficient to survive dismissal. Denying dismissal on materiality grounds is particularly appropriate since materiality is generally an issue of fact. *Cf. Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) (interpreting materiality requirement of § 10(b) of the Securities Exchange Act of 1934). To survive summary judgment, however, @properties would be well-advised to adduce better evidence than a single article to support its claim that potential clients looking to buy or sell real property would be materially influenced in their choice of real estate brokerage company by representations concerning volumes of sales and transactions.

### III. Injury

Finally, B&W claims @properties has not sufficiently alleged any injury suffered as a result of the subject statements. To prevail on a literal falsity claim, a plaintiff must prove that it suffered an actual injury, such as "a loss of sales, profits, or present value (goodwill)." *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1205 (7th Cir. 1990).

To allege injury, the SAC has several charts setting out the percentage change of @properties's and B&W's respective real estate sales volume or number of real estate transactions for each month January through September 2018 as compared to the same month in 2017. (SAC ¶ 139.) The charts portray a trend where, following the publication of the advertisements at issue here, B&W's real estate sales volume or number of real estate transactions in both the City of Chicago and Chicagoland markets did one of the following: (i) increased at a higher rate than @properties's sales volume or number of transactions as compared to the same month of 2017, (ii) increased while @properties's sales volume or number of transactions decreased, or (iii) decreased at a smaller margin than @properties's sales volume or number of transactions decreased. (*Id.*) In January 2018—the month preceding publication of the advertisements—@properties generally saw either a greater increase or smaller decrease than B&W in sales volume or number of transactions as compared to January 2017.[6] Thus, the numbers support @properties's contention that B&W's advertisements diverted potential clients from @properties to B&W. At the pleading stage, these allegations are sufficient to survive dismissal.

Moving forward, however, @properties will need to come forward with evidence that directly links the trends shown in the charts and any claimed reputational damage with B&W's

---

[6] The one exception is that in the City of Chicago, B&W saw a slight increase in number of transactions, whereas @properties had a decrease.

deceptive advertising. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) ("We thus hold that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff."). For now, because @properties has adequately pleaded facts showing B&W made a literally false statement in its advertisements that was material and caused injury to @properties, it has pleaded a literal falsity claim.

## CONCLUSION

For the foregoing reasons, B&W's motion to dismiss (Dkt. No. 77) is denied.

ENTERED:

Dated: August 27, 2019

_____
Andrea R. Wood
United States District Judge